IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ROBERTO ROJAS DUQUE,

    Defendant.

CRIMINAL ACTION FILE NO.

1:20-CR-203-MHC-JKL

## **FINAL REPORT AND RECOMMENDATION**

Defendant Roberto Rojas Duque is charged in this case with possession with intent to distribute methamphetamine and heroin.  [Doc. 1.]  The case is before the Court on Mr. Rojas Duque's "Motion to Suppress Warrantless Traffic Stop" in which he moves to suppress the fruits of a warrantless traffic stop and search of his vehicle, during which approximately three kilograms of methamphetamine were seized.  [Doc. 50.]  On March 10, 2022, I held an evidentiary hearing at which Georgia State Patrol ("GSP") Corporal Jordan Ennis and DEA Special Agent Tyrone Lawary testified.  [Doc. 62 ("Hr'g Tr.").][1]  Following the hearing, Mr.

---

[1] The exhibits admitted into evidence at the hearing are docketed at Docket Entries 56-1 (Def. Ex. 1), 58-1 (Gov't Ex. 1), and 58-2 (Gov't Ex. 2).  A disc

Rojas Duque filed a post-hearing brief [Doc. 63], the government filed a response [Doc. 64], and Mr. Rojas Duque filed a reply [Doc. 66]. For the reasons that follow, it is **RECOMMENDED** that Mr. Rojas Duque's motion be **DENIED**.

## I.    BACKGROUND

In November 2019, the DEA began an investigation into Mr. Rojas Duque's role in trafficking narcotics after a confidential source ("CS") identified Mr. Rojas Duque as his source for heroin. (Hr'g Tr. at 6.) Using that CS, DEA agents purchased heroin from Mr. Rojas Duque in controlled buys; and in connection with those purchases, DEA agents determined that Mr. Rojas Duque drove a 2009 Nissan Murano. (*Id.* at 6-7.) On December 30, 2019, DEA agents applied for and obtained a tracker warrant allowing them to monitor the movements of the Murano. (*Id.* at 7; *see also* Gov't Ex. 1 [Doc. 58-1].)

On January 13, 2020, DEA agents used the CS to arrange another controlled purchase of illicit narcotics from Mr. Rojas Duque. (Hr'g Tr. at 8-9.) This time, however, the agents planned to intercept Mr. Rojas Duque with the drugs en route to the deal. (*Id.* at 9.) To that end, the DEA coordinated with the GSP for a trooper

_____

containing dash camera footage from Cpl. Ennis's patrol car, (Gov't Ex. 3) was also admitted into evidence.

to conduct a traffic stop on Mr. Rojas Duque once the CS confirmed that Mr. Rojas Duque had the drugs with him.  (*Id.* at 9, 20-21.)

On the morning of January 13, the CS communicated with Mr. Rojas Duque to set up a time and place for the drug deal.  (*Id.*)  SA Lawary, who was working with the CS and monitoring his communications with Mr. Rojas Duque, provided updates to the other agents and officers involved in the case via a group WhatsApp chat.  (*Id.* at 9-12; Gov't Ex. 2 [Doc. 58-2].)  Cpl. Ennis and another GSP trooper, Michael Allen, who were assisting with the planned traffic stop, were also part of that group chat.[2]  (Hr'g Tr. at 12-13.)  At around 10:47 a.m., SA Lawary related to the group that the CS had called Mr. Rojas Duque to arrange the meeting, and that Mr. Rojas Duque told the CS he wanted the CS to follow him to an apartment complex.  (*Id.* at 11.)  At around 10:53 a.m., DEA SA Christopher Goode, who was conducting surveillance of Mr. Rojas Duque's residence, reported that Mr. Rojas Duque was getting into the Nissan Murano.  (*Id.*)  Around seven minutes later, SA Lawary reported that CS had had another call with Mr. Rojas Duque in which he stated that he had "1000 pills and 3 kilos."  (*Id.* at 12.)  Cpl. Ennis received that

---

[2] Michael Allen was Cpl. Ennis's supervisor.  (Hr'g Tr. at 41.)

3

message and understood it to mean that there were narcotics in the Murano.  (*Id.* at 29.)

At 11:01 a.m., one of the officers on the group text advised that the Murano was getting onto I-285 westbound.  (Gov't Ex. 2 at 1.)  Shortly thereafter, Cpl. Ennis located the Murano and pulled behind it as it travelled westbound.  (Hr'g Tr. at 29.)  Cpl. Ennis testified that he observed the Murano fail to maintain its lane.[3] (*Id.* at 30.)  Cpl. Ennis did not immediately initiate a traffic stop, however, because there was not enough highway shoulder to safely conduct the stop.  (*Id.* at 32-33.) Once in a safer area, Cpl. Ennis turned on his lights to signal the Murano to stop. (*Id.* at 33.)  By activating his lights, Cpl. Ennis's dash camera was also activated. (*Id.*)  But because the traffic violation that Cpl. Ennis observed occurred more than 30 seconds prior to the activation of his dash camera, the violation was not reflected on the video.[4]  (*Id.*)

---

[3] Cpl. Ennis testified at the suppression hearing that he did not have "a direct recollection" of the particular traffic violation that Mr. Rojas Duque allegedly committed.  (Hr'g Tr. at 30.)  Even so, the incident report that he completed near the time of the traffic stop indicates that he observed the Murano fail to maintain its lane [Doc. 56-1 at 3], and he testified that he typically looks for the drivers to "drive over the fog line or make a large movement outside their lane of travel" prior to performing a traffic stop (Hr'g Tr. at 30).

[4] According to Cpl. Ennis, the dash camera automatically turns on when he activates his lights and sirens, but that he can also manually activate it.  (Hr'g Tr.

Mr. Rojas Duque pulled to the shoulder, stopped the vehicle, jumped out of it, and fled up an embankment on the side of interstate. (Hr'g Tr. at 33.) Cpl. Ennis and a DEA agent chased after him. (*Id.*) As Mr. Rojas Duque was running, he threw bags of drugs from his pockets, which agents later recovered. (*Id.* at 34.) He was eventually apprehended and taken into custody. (*Id.* at 35.) Afterwards, the Murano was searched and multiple kilograms of methamphetamine were seized. (*Id.* at 38.)

## II.    THE PARTIES CONTENTIONS

Mr. Rojas Duque argues that the evidence seized from the Murano should be suppressed because there was no "legitimate basis" for the traffic stop. [Doc. 63 at 5.] Specifically, he argues that the only evidence to support probable cause to perform the traffic stop was the testimony of Cpl. Ennis, but that Cpl. Ennis's testimony is not credible because, he contends, Cpl. Ennis deliberately did not activate his dash camera until after he had pulled the Murano over, despite years of experience and knowing how to manually activate it. [*Id.* at 4-5.] Mr. Rojas Duque argues that Cpl. Ennis should not be believed because he was "combative, hostile

---

at 30-31.) When the camera is activated, the previous 30 seconds of passive video are also included. (*Id.* at 30.)

5

and arrogant" during his examination, and that based on his demeanor, it is reasonable to infer that Cpl. Ennis chose not to activate the camera because Mr. Rojas Duque had not, in fact, committed a traffic violation. [*Id.* at 6.]

The government responds, first, that regardless of whether Mr. Rojas Duque committed a traffic violation, probable cause existed to initiate the traffic stop because Cpl. Ennis was aware, through the collective knowledge of the law enforcement team comprised of DEA and GSP officials, that Mr. Rojas Duque possessed drugs inside the vehicle. [Doc. 64 at 5-6.]  Next, the government contends that even if Cpl. Ennis did not have actual or constructive knowledge of Mr. Rojas Duque's drugs, Cpl. Ennis's observation of the traffic violation provided probable cause to stop the vehicle. [*Id.* at 7-8.] The government further argues that even though Cpl. Ennis did not independently recall the violation itself, he documented the violation in the incident report and, in any event, an officer's testimony that a traffic violation occurred is sufficient to show probable cause even where it is not depicted on a video. [*Id.* at 8.]

Separately, the government also argues that Mr. Rojas Duque lacks standing to contest the search of the vehicle in the first place because he abandoned it when he fled the scene following the traffic stop. [Doc. 64 at 9-10.]  Finally, the

6

government asserts that even if Mr. Rojas Duque had standing to contest the search of the vehicle, the warrantless search was lawful under the automobile exception to the Fourth Amendment. [*Id.* at 10-11.]

In reply, Mr. Rojas Duque argues that because the stop was illegal, his flight did not constitute abandonment of this vehicle. [Doc. 66 at 1-2.]

## III.   DISCUSSION

I start by addressing the constitutionality of the traffic stop, and then turn to the validity of the search of the Murano.

### A.   Regardless of Whether Cpl. Ennis Observed a Traffic Violation, Probable Cause Existed to Stop Mr. Rojas Duque.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Clark*, 32 F.4th 1080, 1087 (11th Cir. 2022) (*quoting United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). Generally speaking, an officer may stop a vehicle "when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic violations and equipment regulations relating to the operation of motor vehicles." *Id.* (quoting *United States v. Hawkins*, 934 F.3d 1251, 1259 (11th Cir. 2019)).

More importantly for the present case, probable cause also exists "where the facts and circumstances within the collective knowledge of the law enforcement officials are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Pierre,* 825 F.3d 1183, 1192 (11th Cir. 2016) (cleaned up) (quoting *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986)).

As noted above, Mr. Rojas Duque primarily challenges the constitutionality of the traffic stop on the grounds that the record is insufficient to establish that he actually committed a traffic violation when Cpl. Ennis pulled him over. The undersigned agrees that the government's case for establishing probable cause for that violation is weak. Cpl. Ennis testified that he typically waits for a driver to cross the fog line or make a large movement out of its lane of travel before initiating a stop, but since he had no independent recollection of the events on January 13, 2020, he could not provide any detail about how Mr. Rojas Duque allegedly failed to maintain his lane. Cpl. Ennis's incident report also fails to fill in the blanks. The report summarily indicates that Mr. Rojas Duque failed to maintain his lane, but like Cpl. Ennis's testimony, it provides no information about how the violation

8

occurred.[5]   So even if the court fully credits Cpl. Ennis's testimony and his investigative report, the government still has not provided any detail whatsoever concerning how Mr. Rojas Duque allegedly failed to maintain his lane. Accordingly, I am skeptical that the government has met its burden to show that there was probable cause to believe that a traffic violation occurred.[6]

---

[5] The applicable statute, O.C.G.A. § 40-6-48(1), provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety . . . .

At least one judge on this court has found that "in the absence of . . . additional conduct, the mere touching of the white dashed line between two or more clearly marked lanes is insufficient to support probable cause to believe that a violation of O.C.G.A. § 40-6-48(1) has occurred." *United States v. Bryson*, No. 1:13-CR-09-ODE-GGB, 2013 WL 5739055, at *4 (N.D. Ga. Oct. 21, 2013). Without additional detail about how Mr. Rojas Duque supposedly failed to maintain his lane, it is virtually impossible to determine whether probable cause existed to believe that a violation of O.C.G.A. § 40-6-48(1) even occurred.

[6] The government cites *United States v. Warnock*, No. 1:14-CR-15-AT-1, 2018 WL 4927722 (N.D. Ga. Oct. 11, 2018), in support its position that an officer's testimony is sufficient to establish probable cause for a traffic stop. [Doc. 64 at 8.] *Warnock* is distinguishable because there, one of two state troopers who conducted a traffic stop testified that he observed the defendant twice cross the fog line and that the defendant's driving pattern indicated he might be impaired. 2018 WL 4927722, at *2. No similar testimony about the details of the alleged offense was offered in this case.

9

But the Court need not decide whether there was probable cause to believe that Mr. Rojas Duque committed a traffic violation because, as the government correctly points out, Cpl. Ennis had probable cause to believe that Mr. Rojas Duque's was transporting significant quantities of methamphetamine to an illicit drug deal in violation of 21 U.S.C. § 841(a)(1).

"In deciding whether a search or seizure was justified, this Court may look to the collective knowledge of the law enforcement officials involved in an investigation 'if they maintained at least a minimal level of communication during their investigation.'" *United States v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020) (quoting *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)).  Here, Cpl. Ennis was included in the group text exchange with other members of law enforcement on the morning of January 13, and prior to initiating the traffic stop, Cpl. Ennis knew of the agents' surveillance of Mr. Rojas Duque, Mr. Rojas Duque's phone calls with the CS, and Mr. Rojas Duque's statement that he possessed three kilograms of methamphetamine and 1000 pills.  In addition, during this entire period, the DEA was monitoring the movements of the Murano based on the tracker warrant.  In these circumstances, the Court readily concludes that the law enforcement officers with the DEA and GSP were in sufficient communication

to allow their collective knowledge to serve to establish probable cause. "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *Jimenez*, 780 F.2d at 978 (quotation omitted). In this case, that collective knowledge would lead a reasonable person to believe that Mr. Rojas Duque was transporting significant amounts of illegal drugs. Accordingly, Cpl. Ennis had probable cause to stop Mr. Rojas Duque, regardless of whether he actually committed a driving offense.

> **B.    The Seizure of the Drugs from the Murano Did Not Violate the Fourth Amendment.**

Having concluded that probable cause supported the stop of the Murano, the next issue is whether the warrantless search of the vehicle was constitutional. The government argues that Mr. Rojas Duque lacks standing to challenge the search because he abandoned the vehicle by fleeing, but that even if he had standing, the search falls within the automobile exception. The government is correct on both counts.

I start with standing. To challenge a seizure as violating the Fourth Amendment, a defendant must show that he has a legitimate expectation of privacy

in the premises being searched—commonly referred to as "standing." *See United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018). "One who voluntarily abandons personal property in the Fourth Amendment sense abandons one's reasonable expectation of privacy in that property and cannot challenge the constitutionality of its subsequent search or seizure." *United States v. Ollervides-Sanchez*, No. 1:10-CR-285, 2010 WL 5648719, at *4 (N.D. Ga. Dec. 29, 2010) (citation omitted), *report and recommendation adopted*, 2011 WL 282175 (N.D. Ga. Jan. 24, 2011). "In determining whether there has been abandonment, the critical inquiry is whether the person prejudiced by the search voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001) (cleaned up; citation omitted). A driver of a vehicle can be deemed to voluntarily abandon any property interest in the vehicle when he flees the car to evade the police. *See United States v. Falsey*, 566 F. App'x 864, 867 (11th Cir. 2014) (finding a defendant's mistaken belief that he was being pursued by police did not render the abandonment of a car involuntary, and collecting cases finding abandonment when a defendant left a car and fled from police on foot); *United*

*States v. Jefferson*, 451 F. App'x 833, 834 (11th Cir. 2011) (finding that defendant abandoned car by fleeing from traffic stop).

Here, immediately after Cpl. Ennis performed the traffic stop, Mr. Rojas Duque fled on foot, leaving the Murano unattended on the side of the expressway. And as he was running away, he threw bags containing drugs from his pockets. Considering these circumstances in totality, the only "conceivable basis" for his leaving the car, then, was to disassociate himself with the car. *See Falsey*, 566 F. App'x at 867. Thus, the undersigned finds that he abandoned any expectation of privacy in the Murano when he fled the scene.[7]

But even if Mr. Rojas Duque had not abandoned any reasonable expectation of privacy in the Murano, the search was valid under the automobile exception. Under the automobile exception to the warrant requirement, the police may conduct a warrantless search of a vehicle if (1) it is readily mobile and (2) probable cause exists for the search. *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). A vehicle is "readily mobile" if it is operational. *Id.* Thus, probable cause exists

---

[7] Mr. Rojas Duque contends that he did not abandon the vehicle because the stop was not founded on probable cause. [*See* Doc. 66 at 1-2.] As just discussed, however, probable cause did exist in relation to Mr. Rojas Duque's possession of illicit drugs, and he has not offered any other argument to contradict his abandonment of the Murano.

for a search where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle.  *Id.*

Here, there is no dispute that the Murano was operational and, therefore, readily mobile, since Mr. Rojas Duque was observed driving it on a public roadway.  Likewise, probable cause existed to believe that the vehicle contained contraband or evidence of a crime (namely, possession with intent to distribute methamphetamine) for the same reasons that probable cause existed for Cpl. Ennis to perform the stop in the first place.  Moreover, Mr. Rojas Duque's efforts, as he fled the traffic stop, to discard packages of drugs from his person provided additional cause to believe that the vehicle would contain further evidence of drug trafficking.  For these reasons, the court finds that the agents were authorized to conduct a warrantless search of the Murano pursuant to the automobile exception and that, Mr. Rojas Duque's motion to suppress the fruits of that search should be denied.

## IV.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Mr. Rojas Duque's motion to suppress [Doc. 50] be **DENIED**.

14

I have now addressed all referred pretrial matters relating to Mr. Rojas Duque and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 3rd day of June, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge

15